The next matter is the New Jersey Department of Environmental Protection v. the NRC. Good afternoon. Eileen Kelly, Deputy Attorney General for the State of New Jersey, Department of Environmental Protection. May it please the Court. The basic questions presented by this case are first, I think, whether the National Environmental Policy Act calls for a site-specific review of the threat of terrorism, airborne terrorism, on the Oyster Creek facility, and also whether there are any procedures available for New Jersey to bring this to the NRC's attention, other than through a request for a rule amendment. Well, before you get to those issues, what is our standard of review here? Because as I read the briefs, I discerned a certain disparity between the positions of the parties as to our standard of review. In the end, how much it matters, I wait to hear your responses. Well, we believe the standard of review here is that for a legal decision, because the NRC's decision, if you look at the language, says that it's deciding as a matter of law that there's no legal duty to look at terrorism issues underneath it because I thought you'd suggest a reasonableness standard here. That is a reasonableness standard, Your Honor. All right. And again, the government has urged upon us an arbitrary and capricious standard. Is that right? Well, Your Honor, we disagree because it really is a legal determination here that the NRC is not going to consider these issues across the board. And in fact, I bring to the Court's attention that in the Massachusetts rulemaking petition that gave rise to the Massachusetts case that was brought to the Court's attention by the NRC, NRC has recently denied that rulemaking. And one of the reasons also was that the causal nexus between the risk of terrorism and the licensing proceeding was too remote. And I think that is a legal determination. Let me ask you this, and we haven't conferred on this case, but I cannot get over this hurdle. Maybe you can help me clear it. It seems to me that when we can talk about risk of terrorism, what you're concerned about is the result of what could happen because of an act of terrorism, particularly to the reactor. And the most profound thing I guess that could happen, certainly not being a nuclear physicist, is for a complete meltdown of the core. A complete meltdown of the core caused by the force of an airplane or a bomb, but here I guess we're talking about an airplane deliberately being run into the reactor building, causing damage which results in a complete meltdown of the core. Is that really what you're concerned about? That's part of the contention, but I think at least the other portion of the contention was the impacts, the potential impacts on the spent fuel pool, which is... That's part of the damage. I did limit it to the core, but if the core melts down, it's going to carry over the spent fuel pool too. Right. Well, I think that would be so much of a larger effect that it almost wouldn't matter at that point. Another kind of a chain reaction. That's your concern, isn't it? A release of radiation into the environment that would result from the meltdown of the core and if that would spill over and generate enough heat to also hit the spent fuel rods, the additional radiation coming out of that. Well, I think the concern here is a little bit different. The Oyster Creek facility has an unusual design and the spent fuel pool, whereas in most facilities, I believe all but two in the United States, the pool is low, it's underground, it's protected. It's elevated. That's part of what would factor in to possibly the spread of the radiation, the fact that the spent fuel rods are elevated, they're not on the ground, and I don't know if that makes the damage more or less. If it's on the ground, it might have more of a contact with absorption of the groundwater. I don't know. Or it might create enough force to spew particulates into the air that are radioactive. Exactly. I just don't know. And I'm not... And we don't know either, and that is the vulnerability and the... Isn't that dealt with in the serious accident management analysis? Well, the serious accident management analysis for this issue is a generic one, and it doesn't deal... Why does it... That's my concern. If you have a meltdown and include... When I say meltdown, include the spent fuel rods. If you have a meltdown of the nuclear reactor, does it matter if it's because of human... a chain event of human failure within the reactor control or if it's an active sabotage of a bomb being brought into the plant, if it's a plane being deliberately hitting into the reactor building? The problem is not the sabotage from the plane or the bomb or the human failure. The problem is the release of radiation into the environment. That's the problem. The problem is not the active causative agent, is it? The EIS is supposed to tell us what the environmental impact, the effects are. So what difference does it make as to the cause of the effects? The severe action mitigation alternatives is actually explicitly required by NEPA, which requires looking at design alternatives. But the NRC says that the effect from an airborne terrorist assault would be no different from an internal cause, which they have assessed. So what would an EIS add to the whole thing? From an internal perspective, it would be no worse than the worst accident. What it would add would be a look at the resistance or the potential resistance of this facility to airborne terrorism. It's never been looked at. Let me say, I have been very involved in court security in the past. And court security is not something we look at for each courthouse to make up its own design. Court security is something that is applied to all courts. And as it is applied to courts, they deal with particular characteristics of a court. But it is a central function to make sure that people at different locations don't have different reactions to security, to make sure that the assets you have for security are spent evenly. Finally, it seems to me that the NRC is doing the same thing in its terrorist prevention programs, which apply equally to all nuclear plants. And that to the extent that we're talking about security and protection from terrorists, that this is not something that should focus on this particular plant, but it should be done nationwide, as from my reading of the briefs, it apparently is being done. But as for the harm that's caused, I am hung up on the same problem that Judge McKee and Judge Smith are, that if the most serious harm is what would happen from a severe accident, what do we gain? The security analysis is different than the design analysis. And, in fact, I agree. They have looked at it as an across-the-board type of analysis, and they have looked at how it impacts on specific facilities, with different orders that are to specific facilities. What New Jersey is asking for is a SAMA review, which is a view of the design alternatives that would make it less vulnerable, or to see if it's necessary, really, that is what NEPA requires. Supplement 28 basically gives you what you need, if the real concern is the release of the radiation. It doesn't matter if the release of the radiation comes from, this is a forced water, I guess, reactor design, if it's this kind of design, or another design, or if the spent fuel rods are contained in a facility that's on the ground, or under the ground, or if they're contained off-site in some remote location, and there are no spent fuel rods that close to the reactor. Does it matter? Again, what you're concerned about, the only reason the spent fuel rods are relevant, is because that's another source of radiation. That's the only reason they're relevant here. And so does it matter what causes the radiation to get into the air? Their concern, and you may agree or disagree with them on their conclusion, but all the NEPA requires is that they consider it. If they consider the release of radiation into the air, why does it matter whether it's a core meltdown, because they put too much fuel into it, and the reaction got out of control, and couldn't be contained within the medium, or if it's caused by somebody ramming a plane. Why does it matter? I would say that the horse is already out of the barn at that point. This is something to look at at an earlier juncture. Horses are gamma rays and beta rays. The horse is the radiation. Yes, that's the horse. And the horse is going to be the same, whether it's driven by the long ranger, or by some whacked out guy in an airplane. Or how about an EIS that assesses the danger presented by a meteor strike? Or an earthquake. Well, I think NRC does do earthquake reviews, but I think in light of 9-11 and all the terrorism and concerns and actions that NRC has taken since 9-11, it's not... Wait, wait, wait. The actions that NRC has taken. What do they have in the way of relevance to the need, well known, for an EIS? Well, I think it shows that NRC and the federal government in general have recognized that there is an important risk. It's recognized that it has a way to look at these elements, but... What is the risk? What's the risk that 9-11 has made us sensitive to insofar as nuclear reactors are concerned? Well, NRC itself has called it the new risk atmosphere or something in its... But what is the risk? What is the risk? The risk is that we now know... Is it that hundreds of million dollars will have to be spent to repair a containment building, or is it that people living around a reactor are going to be exposed to unsafe levels of radiation? People living around the reactor will be exposed to unsafe radiation. And is the impact of that radiation on the human body if it gets there? Is it going to be any different if it's put there because a plane was crashed into the reactor building or because an earthquake happened and the containment building couldn't hold gas? Your Honor, I still think that's a separate question as to whether or not there is a better design and whether the NRC should look at the question of whether there is a better design that could prevent it from ever getting out in the first place. Because when this was designed in the 60s... That's not what I'm getting at. I'm getting the same thing you're getting at. It's called severe action mitigation alternatives, and that was what the court required them to look at or there was discussion about looking at them in Limerick, in the Limerick case, because some of the alternatives that NEPA requires the agency to look at is whether or not there's a better design, whether or not it should put this facility in this condition and allow it to operate for another 20 years as it is without revisiting questions that were really never visited in the first place. But Judge McKee's question and my question is, even though this is an old design and we don't like this old design, is the harm going to be any different whether the severe accident occurs because of a terrorist, because of overfeeding of the fuel, because of corrosion of the tank? If you have a severe accident, does the harm differ in nature because of what caused it? Well, it would be a harm of a nature that the NRC has not looked at... Well, how would it differ? In terms of a puncture from the air. I'm not talking about whether it's a terrorist or whether it's a saboteur or whether it's an earthquake. We're talking about the harm to the environment that arises because of this event happening. Isn't it, for a severe accident, isn't it basically the same harm across the board? Yes, it would be the worst harm that could probably possibly happen. And we're saying that NEPA... Do you argue with the NRC when they say a severe accident, the harm caused by a severe accident, the most severe accident is no worse or no less worse than the harm caused by an air attack by terrorists? I would say that it's probably no worse just from a layman's perspective, but I also think that NEPA requires you to look at better designs and why can't the NRC look at the question of whether or not there is a better design that would be more resistant to this particular type of attack, which has never been... An attack from the air has never been looked at. But isn't NEPA concerned, again, with the environment as opposed to the structural integrity of a separate... And they're related. I don't want to suggest that the structural integrity of the reactor facility is unrelated to the danger to the environment, but the real issue is the danger to the environment. You could have the strongest container building in the world or the weakest containment building in the world, but one's exposure to gamma and beta radiation is going to be the same if the radiation gets out. It doesn't matter, as George Ross said, whether there's corrosion in the containment building, the water lets out, a reaction starts, and there's nothing there to cool it, and it gets out of control, and there's a runaway chain reaction that melts down the core, or if a plane goes into the containment building, it's going to be the same risk to the environment. They're saying they've looked at the risk to the environment, and maybe I'm missing something, but I thought Supplement 28 specifically did that. And I thought the NRC's opinion, I think it's footnote 15, where they specifically... Footnote 25 specifically got into it, and he, in fact, did it, I think, after 9-11. NEPA's designed to help the agency decide whether it's wise to go forward with this particular action. It's purely procedural. NEPA is purely procedural, isn't it? Yes, it is. So if you got the EIS that you are seeking, what would it do? What would it contribute that everybody doesn't already have in terms of the effect on the environment by damage or a meltdown or whatever occurs to this core? It would require the NRC to look at questions of this particular vulnerability. To take care of the airspace? They're going to use their Air Force to go out and patrol the airspace around the facility? There might be additional containment required. They would have to at least consider it and decide whether... Same as they would for an earthquake, right? Well, I think an airborne impact is different qualitatively than an earthquake, or we don't know if it is or not. They're not saying that it isn't. Once the radiation escapes, it is absolutely no different. It has exactly the same impact on the human cells, on the trees, on the drinking water, on the animals that are grazing out there. It's exactly the same. If radiation gets into my body, it doesn't care if it's coming from nuclear fusion inside the sun or from a core in Oyster Creek. And if it's a core from Oyster Creek, it doesn't care whether it's there because there was a meltdown of the core based upon leakage of the water and attack. My body is going to react exactly the same way. Your Honor, I think that I would be annoyed if it happened to me. Annoyed being a moderate word. And I didn't think that the agency had looked at all the possible alternatives to make it not happen. Well, then you're getting into security. And I don't think a relicensing is the arena in which the security provided to nuclear plants is reviewed. Your Honor, I think it's a separate question. When you look at individual security or whether you... When NRC looked at security, it decided not to look at airborne terrorism because, again, it did its risk-benefit analysis and risk is likelihood times the degree of harm. And they said, well, it's really highly unlikely we're not going to look at it. We say that was unreasonable. But it's a separate inquiry whether or not NRC should go ahead with the licensing of this particular design without requiring any modifications or whether it's going to do retrofits at a later time. Even if you're right about that, don't you, under our decision in... I call it the limerick case. I guess it's metropolitan medicine. Don't you have to provide them with some qualitative... quantitative framework to conduct the analysis that you're saying they must... to combine the percentage, the likelihood of risk with the consequence of the harm, the gravity of the consequence? Don't you have to provide some analytical framework under limerick? You have to come forward with it, don't you? Yes, Your Honor. But I think this might be the physically broken leg case that the last case was discussing. NRC has undertaken reviews and it's, as you pointed out, adopted its design basis rule where it assessed this threat for a different purpose. And here we're saying that they can... it's pretty obvious what they can do. And I believe the Supreme Court in the public citizen's case said there were some instances where it's just so obvious that you really don't have to come forward with a methodology. Well, but in public citizen they also talked about the rule of reason and the issue was once you get the information, if you can't do anything with it, then is it the obligation of the agency to undertake the inquiry? I think here they can do something with it, Your Honor. They could require some measures to be taken to make the spent fuel pool less vulnerable. It goes back to Judge Roth's question. That gets into a security... you could amend the statute and give the agency the kind of security concerns that you're foisting on them. I don't mean foisting in a negative or pejorative way, putting on them. But until you do that, the agency's concern is the environment. And you can certainly argue, and you have argued forcefully, that you can't separate the environmental impact of something happening from the security breach which allows it to happen. As I read the statute, what they have to take into concern is what happens to it if it's breached, not how you necessarily go about preventing the breach. That's a separate security concern and I'm not sure that that was ever Congress's intention drafting NEPA. I think that... I mean, I agree with your analysis in the sense that I think that NEPA doesn't really matter if it's a deliberate harm or not. But if it's another source of possible accidents that we don't know if they would be of a different kind or not because the NRC has never looked at it, we don't know if it would be quantitatively different. So, it's a different... Now we are on the broken leg. How, again, I hate to sound like the pervert of broken record. How could it possibly be quantitatively different unless there's some reason to believe that somehow if the diesel fuel gets vaporized by the radiation, it can carry... and maybe that's true. Maybe the heat from the containment building would disperse the nuclear fuel further than the individual's atomic particles would be dispersed absent the nuclear... Something probably like that, maybe it makes a difference. And in that case, maybe it would make a difference to the environment. But there's no showing that that's at all relevant. And again, they've done a look at it under, as I read it, Supplement 28, and they've come up and said that they've gone, basically, to quote Oklahoma, they've gone about as far as they can go in that area. I would say it's different, not in the sense, again, of what would ultimately result so much as it is that it's different in the sense that it might be more easy to... easily happen or might be more likely to happen. And that the agency has an obligation when this... It hasn't looked at it because it said in its G.E.I.S. that it's so unlikely that it's not necessary. But at some point... And that means we've got to give them some way of getting around that a little bit. But I think we saved some time for rebuttal, didn't we? I'm sorry, Your Honor? You saved some time for rebuttal and we still haven't heard anything from your colleagues over this. I do, yes. Thank you. Okay, thank you, ma'am. May it please the Court. I'm John Cordes. I'm representing the NRC and the United States in this case. I'm going to speak for 11 minutes and Mr. Brad Fagg, who's representing the AmerGen, who owns the Oyster Creek plant, is going to speak for the last four minutes of our 15 minutes. A lot of time. I think all three of your honors put your finger on one problem in New Jersey's case, namely that if the NRC is required to do a NEPA review of the consequences of terrorism, a proposition we question, on this record they've done it. We've done it. The NRC has done it. There's a generic environmental impact statement here that expressly found, and this is at page 27 of our supplemental appendix, that the risk for sabotage, that's the term, the generic environmental impact statement used for terrorism, is, quote, small. But if it did occur, small because of all the security protections the NRC has in place, that's what the generic statement said. But if it did occur, and I'm again quoting, the radiological release would be no worse than those expected from already analyzed severe accidents. Oyster Creek site-specific EIS, which Judge McKee referred to several times, Supplement 28 made essentially the same finding. That's at Petitioner's Appendix 345. The generic environmental impact statement considered severe reactor accidents, that's the type of accident to which you compared terrorist-caused accidents, extensively in a very long discussion. It's a 99-page discussion. It's in Respondent's Appendix at pages 10 to page 108. This generic environmental impact statement looked at all sorts of things that could happen from severe accidents, including radioactive releases via air and water, including land contamination, economic impacts. The generic environmental impact statement describes the demographic and weather conditions at all the hundred-and-some-odd plants in the United States, including Oyster Creek. Oyster Creek is mentioned specifically in the generic environmental impact statement several times on several charts of various kinds of effects. And where it's not specifically mentioned, the damages discussed are, as the environmental impact statement, the generic one explains, bounded by consequences from other plants that are discussed. The same generic environmental impact statement also examined continuation of spent fuel storage in pools during the license renewal period and possible release scenarios, including accidents, and again found that the environmental effects were likely small, even in severe accidents involving fire. Well, is it clear that if the license was not renewed, the plant would basically be shut down and the spent fuel rods would remain there? Because apparently that's a point of contention. Well, that's a complicated issue, Your Honor. The whole thing is complicated. There's a federal law called the Nuclear Waste Policy Act, which was enacted in the 1980s, which obliges the Department of Energy to accept the spent fuel from all the commercial reactors in the United States and to store it at a permanent repository. Well, there's a Yucca Mountain site that's being contested. Okay. But they're looking seriously at Altoona, I believe. I think Altoona was low-level. I think that was a low-level waste. I have a vested interest in it. There's no harm, no foul. In any event, as I say, there's a statutory scheme for that. Ultimately, the Department of Energy is supposed to accept it. The repository is not yet approved. They're looking at a repository in the desert in Nevada called Yucca Mountain. But it's a controversial matter, and the state of Nevada is opposing it, and it's being contested. Are there other states that it's got to go through to get there, I guess? It would have to be transported to Nevada. Yes, Your Honor. Mr. Curtis, let me inquire into an issue which we did not explore with Ms. Kelly, but that is the NRC's contention, and I think part of the reasoning in the ruling below, that involved a proximate cause analysis. Yes, Your Honor. If we were to sustain your position, do we go through a proximate cause, or as I think Justice Rehnquist said in the MedEd case, something akin to proximate cause analysis here? Right. The Supreme Court in the MedEd case, and reiterated in the public citizen case, said that there has to be a reasonably close causal relationship between the agency action and the feared environmental effects. The Supreme Court analogized it to proximate cause. They didn't come right out and say that you're strictly bound to follow a proximate cause analysis, but that's pretty close to what's going to be endorsed. I think they used the word analogy to proximate cause, and I think Justice Rehnquist's opinion stated explicitly that we're not talking pure tort law, but it's an analogy. That's, I think, what the Court had in mind. I think the proximate cause doctrine in the NEPA context is really a proxy for reasonable limits on the reach of NEPA. NEPA, it's been said, could swallow the world if you have to look at every single consequence that could be linked, could be traced to an agency action in some but-for sense. And the Court decided in the public citizen and the MedEd case that there needs to be limits on that, otherwise agency resources would be consumed and maybe to no good end. In the MedEd case itself, the concern by some citizens in Pennsylvania was stress, psychological stress that would result from restarting the undamaged Three Mile Island reactor back in the 1980s. The Supreme Court did not question that such stress was real and that, in effect, the Court went out of its way, and Justice Brennan, in a concurring opinion, also went out of his way to say, well, this is a plausible concern, a real concern of the citizens. It was highly attenuated because it was a human perception of a risk, and Justice Rehnquist made much of the difference between a risk and the actual occurrence. The Court said that the fear, the perception, as Your Honor put it, broke the chain of proximate causation, even though in a but-for sense, the stress did result from the linkup. So how does that apply here? Well, we think there's a different superseding cause, namely sort of random, unpredictable, horrific terrorist attack. Criminal event. Right. Criminal event of the type of terrorism. We're getting into that, and hopefully we can decide this without getting into that, because if we get into that, I know the restatement of torts is not a layover here. It doesn't apply per se, but as I read, I guess it's 442, Comment B of Section 442, where it's normally a criminal event would be a superseding cause. If the criminal event is reasonably foreseeable, it does not relieve the underlying, in that case, negligence, which gets it back into whether or not the act of sabotage against this specific facility in Ms. Kelly's formulation of the problem is reasonably foreseeable, and then that gets us into the whole calculus of how do you measure that, and is it low probability, high consequence, and how do you get a handle on that? I understand, Your Honor. I'm not saying that's an easy question, although I do think the traditional tort law would say that a crime of the nature of terrorism is not so easily foreseeable because the restatement and the cases under the restatement, some of which are discussed in our brief, think in terms of reasonable foreseeability in terms of some kind of likelihood or probability at the place we're talking about. Well, Judge McKee's question anticipates my follow-up question and really the purpose of my original question, which I sought to imply, and that is must we pursue this kind of analogous proximate cause analysis? You've argued it in your brief, and the NRC, I think, used it as a basis, or the basis for its decision. Is that what we are bound analytically to follow to sustain your position? Well, I have two points in response to that, Your Honor. The NRC in its decision had alternate bases, but this was one of them. As I started to say before, proximate cause, I think, can be approached without the strict prism of tort law. I mean, you could look here, as the Court did in public citizen, using the rubric of proximate cause and the rule of reason, which is another term that is frequently used in NEPA cases, and decide that studying the consequences of terrorism is a bridge too far in this context. I mean, it's really a policy argument. It is a policy argument. I agree with that. That's what proximate cause is. It's a policy argument. And here I think there's policies that argue against it. One is how useful would the environmental study really be, given the extensive security precautions the NRC is already involved in and the very extensive rulemaking and orders that it has issued since the 2001 attacks. Secondly, how practicable is it? Your Honor alluded to the Limerick case. How practicable is it? Your Honor alluded to the Limerick case before. How do you go about getting a handle on this? What is the real risk of terrorism at any particular place? New Jersey's contention certainly offers no real way to get at this. And finally, I would point out that having a NEPA is really a public participation statute. This is a subject that's really peculiarly inapt for broad public participation because key to the risk and the probability and the analysis is, well, how vulnerable is this site really? What do the threat assessments that are available from the CIA and the Defense Department indicate about the kinds of weapons or the kinds of attacks, the kinds of strategies terrorists might use? Is this the kind of thing really that can be useful to the subject of an NRC hearing? I doubt it, Your Honor. And so I think proximate course is sort of a policy label for those kinds of arguments. Because if Ms. Kelly is right about what NEPA requires here, the complications about procedurally how you allow for that, that's not really before us. The issue, I think, is whether she's right about what NEPA requires. It might be difficult to do, but if it requires it. But I'm saying the difficulty of doing it is one of the policy reasons to consider in deciding whether NEPA extends that far. Let me ask you a question, if I may. It seems that Ms. Kelly is really saying this is an old, antiquated nuclear plant that puts wastewater and uses it in a fashion that's a threat and that we just don't want this license renewed. We don't want this plant here. Can't you give us a brand-new modern one that provides less threat to the environment? Is that possible? Is that a valid objection to the relicensing? Well, I would say that the NRC has a process. Well, you went to your coda to your question, Your Honor. No, basically not, because relicensing under the NRC regulations focuses on the particular threats of aging, not on the original design. There were petitions for rulemaking filed recently where petitioners, including some from New Jersey, not the state, the Sierra Club of New Jersey, asked that the NRC revise its relicensing rules to make them just like initial licensing. The NRC just said it would have thought about that and was not going to do that. That was challenged in the Second Circuit, because there were also New York petitioners, and the Second Circuit recently upheld the NRC's approach, a decision I sent to the court in the Rule 28J letter. If New Jersey is right that there's a unique design here, and I don't think it's that unique. I inquired with the NRC staff about this, and there's multiple plants that have a similar containment and have elevated pools like Oyster Creek. New Jersey has two procedural options that NRC rules provide. They could file a petition for rulemaking to change the rules, as Massachusetts did, in the case alluded to in our Rule 28J letter. Alternatively, if they could say that Oyster Creek is an ancient plant, outmoded design, the general rule shouldn't apply to Oyster Creek. The NRC has a rule, 10 CFR Section 2335, that allows the intervener or petitioner for a hearing like New Jersey to ask our administrative hearing tribunal called the licensing board to waive the applicability of the general rules because of special circumstances at a particular plant. When New Jersey didn't follow that process, they didn't do that. And we would submit that in an agency adjudicatory process, New Jersey is obliged to follow the rules of the road, and they didn't do it. They could have done it, and they didn't. Yes. Thank you, Your Honor. Thank you. Mr. Fag? Thank you, Your Honor. Brad Fag from Morgan Lewis for Respondent Amergen, owner and operator of the Oyster Creek Nuclear Plant. I'd like to use my brief time to emphasize a couple of points that I think the colloquy has demonstrated the Court likely appreciates. But to follow up on the last question from Judge Smith, the proximate cause analysis, we do agree with the NRC. We do agree that the Mothers for Peace decision of the Ninth Circuit was wrongly decided on that basis. But emphatically, I want to emphasize that this Court does not need necessarily to buy that analysis wholesale to affirm the decision of the NRC here. There is an alternative holding. That alternative holding is based upon the generic impact statement and the supplemental impact statement, Part 29, as Your Honor has alluded to. And that is the first of three key distinctions I'd like to emphasize. No, so Mothers for Peace is, I think, is our intention with our decision in Limerick, and we're bound by Limerick, not by Mothers for Peace. And the Limerick case, I would suggest, fairly read, is indistinguishable from this case. And New Jersey, just like the petitioner in Limerick, was required, if it was going to succeed, if it was going to get its contention admitted, to come forward with a meaningful way to assess it. And this Court in Limerick rejected that and said it was not going to remand to the NRC for a quote, unquote, standardless proceeding. And with respect, that's exactly what we have here. With respect to the sabotage or the terrorism contention, there is no material distinction between this case and the Limerick case. And that is, as we argued in our briefs, a sufficient basis and ultimately controlling on the result here. But to get back to the distinctions between, again, this case and the Ninth Circuit case, about which so much attention is devoted in the briefs, that first key distinction is this is an adequacy case. The alternative holding of the NRC was that there is an impact statement and New Jersey is attacking that impact statement. That was not the situation in the Ninth Circuit case and the Mothers for Peace case. There, there was an environmental assessment and a finding of no significant impact. It wasn't an adequacy challenge like this case is in the alternative. The second point, and it's a related point, it was alluded to towards the end of Mr. Cordes' presentation, is if there was to be an attack on that determination, there are procedural manners to do that that New Jersey did not comply with here. Either it had to request a waiver if, for example, it believed that the Oyster Creek facility somehow wasn't appropriate for the generic treatment, or it had to pursue a rulemaking like the state of Massachusetts did in the recent First Circuit case. It didn't either. So that is a separate and independent and sufficient ground to affirm the NRC in this case. And the third key distinction, I think, between this case and the Ninth Circuit Mothers for Peace case is, in that case, they were building something new. They were building a facility to store spent nuclear fuel on the site of the power plant in the Ninth Circuit case. In this case, the plant is already there. There's nothing new being built, and so I think it ties back into, ultimately, the sort of change in the environment that lies at the core and at the heart of NEPA. And NEPA, again, as the colloquy has suggested, is at its heart an environmental statute. And in this case, the NRC has appropriately, and we would suggest not arbitrarily or capriciously, assessed the environmental impacts in a bounding analysis, and whether something terrible were to happen from a terrorist act, from an internal event, or for some other cause as yet unimagined, the NRC has looked at that, and no sufficient challenge has been mounted to that determination. If there are no other further questions, I have nothing further. Thank you. Ms. Kelly? Thank you. With respect to the claim that New Jersey should have made a petition for rulemaking, the NRC's rules clearly provide for the type of relief that New Jersey is looking for here. It does, but their point is that you're trying to say that there's something unique about this particular plant would make the generic, the GEIS, inappropriate, and that what you're really requesting is a waiver of the rules, or that you want to initiate a rulemaking procedure. But they're not saying that NEPA does not necessarily pertain to this situation. I think they're saying that the kind of relief that you're seeking against this particular reactor is not appropriate in this kind of a proceeding. Your Honor, we would submit that it is because, aside from the unusual nature of the reactor, the Limerick decision talked about the effects of population and location and said they're almost always unique. But you didn't bring that up until the appeal. Well, we brought it up specifically later, but we asked for a site-specific review in light of the plant's unique design and location. And I think that under the standards in Limerick where you have something that's so obvious, the GEIS says that it's within 50 miles of a number of population centers. It hasn't changed. It's something that the NRC is aware of. And given the decisions of this court and other courts, that's something that you know is part of a site-specific analysis. It sort of hangs near, but I think it's hung up to my colleagues too, at least one, is that it's within 50 miles or however many miles it is of Newark and Philadelphia, regardless of what happens to the cause of radiation release. That's the concern, that no matter, it's clearly very proximately related to high population centers. It's right there in the northeast corridor. I guess the highway runs right through it. I can't remember which one. Garden State Parkway runs right there. But it doesn't matter because the risk, again, is the same no matter what the cause of the escape of the radiation. Well, Your Honor, I think there's greater risks of the impacts here. Well, explain that to me. Well, they're in the flight paths, for example, of a number of airports. Okay, but again, if one of those planes falls, and that's different from what you talked about earlier with the terrorist attack, but if one of the planes falls and hits the reactor, the impact on the environment is exactly the same as if water leaks out of the containment building from some other cause and overheats and the core melts down. We assume that it is. The NRC has never really looked at the impact of an airplane with fire and whatever else is involved, and it's never looked at it at the design phase, and it's not looking at it now even though it has the mechanism to do that. Why would they look at the impact of a meteor striking close enough to the plant to cause enough stress on the containment building to cause a core meltdown? But, Your Honor, they don't look at these things because there's such low risk. Why shouldn't they look at that? Because the probability of that happening is greater than zero. Whatever it is, and I'm not sure we can predict what it is, but we would all agree that it's greater than zero. It's not impossible for that to happen. Why shouldn't they have to look at that? But, Your Honor, New Jersey's not asking them to look at it just because terrorism, airborne terrorism, just because its risk is greater than zero. It's asking them to look at it because NRC itself has recognized that there is a substantial risk, but has said that they're not going to deal with it in the design, and we believe that there are... That doesn't mean they're not dealing with it. They're not dealing with it in the... In that context. It has said that it is not going to look at the question of any additional risk from airborne terrorism because it's so remote and speculative as a matter of law, and it didn't look at it when this plant was designed, and when it did its design-based threat analysis... Well, it didn't exist when this plant was designed. Now, if you feel that it should look at it now, why didn't you ask for a waiver in the relicensing? Well, Your Honor, I think we didn't ask for a waiver because, well, first of all, I don't know of any waiver that's ever been granted by the NRC, but also the standard of does not... It's very unclear, and we think the more direct path was this is new information regarding the development of risk, what NRC calls the new terrorism atmosphere or something similar in its DBT rule, and that's new information, and that seemed to be a more direct path to this than the application for a waiver because the GEIS itself seems to say that it's going to be supplemented with additional information, so the rule assumes, as it must under Limerick and other cases, that where there's new information that affects the conclusions of the GEIS, they're going to be looked at in light of that, and what the NRC is saying is that this rule means nothing because if the new and significant information changes the GEIS 1 iota, everybody has to go back to the drawing board and try to get a rule changed. Well, I think it depends on what the nature of the change is, but we do understand your argument. It has been very forcefully and ably argued on all sides, and we'll take matter under advisement. Thank you. Thank you.